Filed 2/26/26  P. v. Vanderford CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)
----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>KENNETH VANDERFORD,<br><br>    Defendant and Appellant. | C097817<br><br>(Super. Ct. No. LOD-CR-FECOD-2017-0000573) |

Defendant Kenneth Vanderford appeals from his convictions of murdering Dorothy Wiederrich and Alan Gregor and for robbery, burglary, and arson.  He contends the trial court committed instructional errors, the court improperly admitted unqualified expert witness testimony, trial counsel rendered ineffective assistance, the prosecutor committed misconduct when cross-examining defendant and when arguing in rebuttal, the court committed sentencing error, and cumulative error.

Except to strike one of the two multiple-murder special circumstances found true, we affirm the judgment.

1

Defendant was tried with codefendant Kevin Etherton.  Each had his own jury.

I

*Prosecution's Case in Chief*

<u>Murder</u> <u>of</u> <u>Dorothy</u> <u>Wiederrich</u>

Dorothy Wiederrich lived alone in Lodi in 2016.  At the time of her murder, she was 74 years old.  Wiederrich's son, Johnny B., visited Wiederrich each weekday from morning until the afternoon.  Another son, William B., visited Wiederrich on Sundays. He would take her to church and then to lunch.

Family and friends knew Wiederrich was "fairly well-off."  She lived in a nice neighborhood and drove a new car.  She was a "pretty private person."  If an uninvited guest came to her house, she might speak through the door to the person, or she might ignore the knock completely.  She would not open the door.  Her family members would call her before going to her house and inform her they were coming.

The house's front door was secured by a dead-bolt lock operated by a digital keypad outside.  Entering a code on the keypad would unlock the door.  At the time of Wiederrich's death, Johnny, William, William's daughter Amber C., a housekeeper, and Katrina J. knew the code to open the door.  Wiederrich had hired Katrina to perform errands at the house and keep her company.  Katrina worked every weekday and arrived at a set time.  She entered Wiederrich's house by using the key code.  At the time, Katrina was defendant's wife.

Wiederrich's granddaughter, Amber, met Katrina in a halfway house in 2005, and they became close friends.  Katrina and defendant lived with Amber rent free in 2013 or 2014 to save money "to get back on their feet."  Amber asked them to leave when she realized they had not saved any money.

Amber had introduced Katrina to Wiederrich. Katrina had a background in caring for elderly persons. When Wiederrich was looking to replace her caregiver, Amber recommended Katrina to Wiederrich. The two developed a good relationship. Katrina and defendant attended Wiederrich's family events. Defendant and Wiederrich also appeared to get along. On occasions, Katrina took defendant with her to Wiederrich's house. Defendant had been to Wiederrich's house two or three times by himself, once according to Wiederrich to pick something up or drop something off for Katrina. Katrina denied ever sending defendant to Wiederrich's house to pick something up or drop something off. She had never known defendant to go there without her. She denied sharing the house's key code, and she denied giving the code to codefendant Etherton.

At one point, Wiederrich helped Katrina and defendant buy a vehicle. They were having financial problems, and their car was unsafe. Wiederrich loaned Katrina money to purchase a red Ford F-150 pickup. Amber normally saw defendant driving the truck.

Katrina worked for Wiederrich for between one and two years. Eventually, Wiederrich let Katrina go. Katrina had stopped showing up for work on a consistent basis. She had problems with her back and suffered from mental health issues. Katrina and defendant were upset when Wiederrich let Katrina go, defendant more so than Katrina. Defendant wanted to speak with Wiederrich about it, but Amber and her husband told him it was not necessary. Wiederrich's son Johnny began providing care for Wiederrich after Katrina was let go.

On February 12, 2016, Johnny left Wiederrich's house around 3:30 p.m. Wiederrich was fine when he left. He did not expect Wiederrich would have company that night. Amber called Wiederrich that evening at 5:17 p.m. The family was planning a trip to Hawaii, and Amber wanted to reassure Wiederrich they would make an itinerary for the trip. Nothing in the conversation caused Amber any concern for Wiederrich's wellbeing.

3

The next day, February 13, 2016, Johnny arrived at Wiederrich's house around 7:15 a.m. He entered the code to open the front door and went in. He walked into the kitchen and found Wiederrich lying on the floor in a large puddle of blood. She was cold to the touch. Johnny called 911. A knife was lying next to Wiederrich. Her hands were tied behind her back.

It appeared to Johnny that someone had gone through Wiederrich's belongings. He noticed that Wiederrich's wallet was open on the counter and her purse had been dumped upside down in the kitchen sink. In the bedroom, a jewelry box was upside down on the dresser, and drawers were pulled out.

Police officers found no signs of a forced entry. The garage was closed, and the side gate was locked. There was no indication anyone had been in the backyard. In the kitchen, Wiederrich was lying on the floor wearing light colored pajamas. She had been gagged with a blue handkerchief that was tied around the back of her head. Her hands were bound behind her body by zip ties, six of which were recovered at the scene.

A knife was lying a foot or two away from Wiederrich's body. It was a kitchen-style knife approximately 13 inches long. It had an eight-inch serrated blade and a wood handle. Wiederrich appeared to have multiple stab wounds in her chest. Officers found small traces of blood throughout the residence, but there were no signs of a struggle.

Records from Wiederrich's alarm company showed that on February 12, 2016, the day of the murder, Wiederrich's front door was opened and closed at 6:35 p.m. and again at 6:54 p.m. There was no activity in the house until the front door was opened the next morning at 7:19 a.m., which was around the time Johnny had arrived at the house.

After learning of Wiederrich's murder, Amber called Katrina and relayed the news. Katrina became very upset. Katrina testified that on the day she received the news, she noticed that defendant's hand had skin tears and "was pretty scratched up, beat up."

A few days later, Katrina and defendant brought some food to Amber's house. Defendant, sitting with his hands crossed, consoled Amber and tried to cheer her up.

4

Amber noticed that defendant had a large sore on his right forefinger that looked as if he had rubbed a blister raw. When asked what had happened, defendant said it must have come from driving his car, and then he covered his hand back up.

The evening after the murder, Wiederrich's son William went through his mother's house to see if anything was missing. Wiederrich had owned two guns: a revolver and a .25 automatic Raven. William could not find the guns in the house.

Within a week of the murder, Amber was allowed to enter Wiederrich's house. She noticed that a jewelry box she had given to Wiederrich for Christmas had been emptied. When the police allowed the family to pick up some of her things, the family noticed that among the missing jewelry was a ring Wiederrich had bought in San Francisco on a "girl's trip" with Amber's daughter and Katrina. The ring was a large, thick white gold band that had a large circular diamond raised off the band and other diamonds. Wiederrich wore the ring on her wedding band finger every day as a replacement for the original ring her husband had given her. Amber found a receipt for the ring in one of Wiederrich's drawers, and she gave the receipt to the police. The ring had cost Wiederrich $14,681. Katrina testified that after she returned from the San Francisco trip with Wiederrich, she spoke with defendant about the ring Wiederrich had purchased and its cost.

On February 22, 2016, approximately 10 days after Wiederrich's murder, codefendant Etherton sold Wiederrich's diamond ring to a pawn shop in Oakland for $700. The ring was a wedding ring made of 18 carat white gold. It had a two carat center stone diamond. Etherton entered the shop by himself. But evidence showed that defendant's cell phone was near the pawnshop in Oakland at the time Etherton sold the ring.

5

<u>Murder</u> <u>of</u> <u>Alan</u> <u>Gregor</u>

Alan Gregor was 52 years old when he was murdered. He lived alone in Lodi. He worked as an employee recruiter, but by 2016, he was struggling financially due to the impact of the internet on his business. He also underwent hip replacement surgery that year, but he had felt better since the surgery. Gregor was known to drink alcohol excessively. His sister believed he was a "functioning alcoholic."

Gregor was due to receive an inheritance from his grandfather's retirement account. The account held approximately $120,000. Each heir was to inherit approximately $8,700. Checks from the account were distributed to the heirs the week after Gregor was killed.

Beginning in August 2016, codefendant Etherton worked as an independent contractor selling Kirby vacuums. In that business, dealers such as Etherton would knock on doors to set appointments to come back later that day and clean a section of the resident's carpet. If the dealer set an appointment, the dealer would inform the team leader by text message. Then the dealer and the team leader would return with the equipment, a process called a "walk in." They would begin cleaning the resident's carpet, determine if the potential customer had good credit, and attempt to sell the equipment.

On September 21, 2016, Etherton sent his team leader, Ryan F., a text identifying Gregor and stating his address. Ryan met with Etherton and Gregor that day to close the deal, but he believed Gregor was too intoxicated at the time to negotiate a sale. In those situations, the business practice was to leave and not come back or schedule a return appointment. Gregor also acted like he had good credit and a lot of money. Ryan ran Gregor's credit and learned it was bad. No sale was made.

Etherton was upset. Gregor had told him he would buy the equipment. But after Etherton had likely shampooed the carpet, Gregor backed out and said he did not want it. In this situation, Ryan would not have told Etherton to go back to Gregor. Gregor had

6

bad credit, and almost all customers who do not buy the product while the salespeople are there do not buy it later.

On September 25, 2016, at approximately 1:43 p.m., Lodi firefighters responded to a report of a fire at Gregor's residence. The fire was coming from inside the home. Learning from a police officer that the occupant was believed to be home, the firefighters made entry through the front door to extinguish the fire as quickly as possible and initiate a search for a possible victim. Inside, the entire living room "had fire involvement." Firefighters were able to put the fire out within a minute and a half. The back sliding glass door was open, which had probably ventilated the fire. It appeared the door had been opened before firefighters arrived.

Once the smoke, heat, and steam cleared, firefighters discovered Gregor's body in the living room. He was lying on his back on the floor between a sofa recliner and a table. All of his body was burned. Police officers found blood around the body and the couch. A subsequent autopsy revealed that Gregor had been stabbed around his heart, across his throat, and in his neck.

Investigators determined the fire had originated from the sofa recliner in the living room. Gregor's body was found next to the recliner. Folded laundry that had been placed on the sofa was tested for residue from an ignitable liquid. Testing on two of the items revealed a medium petroleum distillate, such as charcoal, lighter fluid, or some paint thinners. From this evidence, the investigators concluded the fire had been intentionally set.

Investigators retrieved surveillance video from a neighbor's outside camera. The video depicted a red Ford pickup truck pass by four times on September 25, 2016, in a 30 or 40 minute time frame. The video showed the truck pass by going in the direction towards Gregor's house at approximately 1:00 p.m. Pacific time. (The time on the video display was displayed in Eastern Time, three hours ahead of the actual time.) Two people were in the cab. The truck appeared again at approximately 1:15 p.m. traveling the

7

opposite direction. At 1:16 p.m., the truck appeared traveling towards Gregor's home. It next appeared on the video at 1:40 p.m. traveling in the direction away from Gregor's home.

Detectives released still photos of the truck and a news release to media outlets and posted them on social media. Dorothy Wiederrich's granddaughter, Amber C., saw the photographs and recognized the truck as defendant and Katrina J.'s red pickup. Amber reported her identification to Lodi detectives. Officers later saw the truck at defendant's residence in Stockton.

Katrina's brother sent her a picture of the truck and texted that authorities wanted to question the truck's occupants about a homicide. Katrina thought her brother was joking, and she told him it wasn't funny. Katrina forwarded the picture to Amber, stating, " 'Do you see what my brother is doing right now?' "

Katrina initially thought the truck in the picture was not her truck. She realized the picture was in fact her truck while at the police station in January 2017, when the police had asked her and defendant to meet with them. The police showed Katrina a blowup of the picture, and she saw defendant in the truck. She told the police it was her truck, and that one of the men in the picture was her husband.

Police investigation

On January 12, 2017, police spoke with codefendant Kevin Etherton. Initially, officers met Etherton at his home and asked him to speak with them at the station because he may have been a witness to something in Lodi. Etherton agreed and drove himself to the police station.

At the same time, police were questioning defendant at the police station. His cell phone was on a table. At one point, the cell phone illuminated with a text message. The sender's name was Kevin. The message stated, "[T]he Lodi Police Department just showed up at my house."

8

At the station, Etherton said he spent a lot of time in Lodi doing his Kirby sales and hanging out with his friend, defendant. Asked if he had ever been in defendant's truck, Etherton said, " 'Too many drunks ago.' " A video of the interview was played to the jury.

Etherton said defendant was a personal friend he would hang out with. Defendant worked for U.S. Security doing nightshift at the Lodi train station. Defendant did not go with Etherton on Etherton's Kirby work. The two would hang out, and defendant would ask him computer questions about VPNs and the dark web. Etherton did not know the make of defendant's truck, but he knew it was red.

Etherton said he had Kirby appointments on September 21 at an address which was Gregor's house and another house on the same street. Asked if they ever went back to homes they visited, Etherton said it was rare. The customer would have to be seriously interested for them to go back.

The interviewing detective stated the police knew that Etherton and defendant went to Gregor's house on September 25. Etherton said they did what was called a "check back" with "Alan. The drunk. Head hunter." Gregor had told Etherton on the 21st that he had a couple of leads for him and to come back. Etherton said he and defendant went inside the house and asked Gregor to buy. Gregor seemed agitated and drunk. They weren't there very long and left after Gregor did not give any information. Etherton thought they were there for no more than 25 minutes.

Etherton said Gregor was alive when he and defendant left. While they had spoken with each other, Gregor said he had "unlocked like $150,000" from his grandfather's pension. Etherton exited Gregor's house first and waited in the truck's passenger side. Defendant came out about two minutes later. As defendant drove, he favored his right arm and drove with his left arm.

Detectives asked Etherton to tell the truth, because Etherton's story differed from what defendant had told them. Etherton said defendant "scares the shit out of me."

9

Defendant came out of the house through the back door and was carrying a bag. He had blood on his pants and his shirt. Etherton did not know what had happened in the house and he was too scared at the time to ask questions.

Etherton said that when Gregor had spoken about his grandfather's pension and said the money was sitting in an account, defendant perked up. His body language became aggressive, and he raised his voice. He stood up straight and looked like he was getting ready to throw some punches. Asked by detectives if at that point he had an idea of what was going to happen, Etherton said, "Kinda, yeah. Probably."

After Etherton went to the truck, he could hear what sounded like a struggle inside the house. Defendant came out from the back carrying a paper bag, and inside the bag were what looked like clothes, a little bit of "weed," and some wires. He had been in the house some 10 to 15 minutes since Etherton had walked out. Etherton asked defendant what had happened. Defendant said, " 'Don't worry about it,' " and they left. Etherton did not know how the fire had started.

Etherton said he knew what had happened in part because of how much blood was on defendant when he came out of Gregor's house. He had also learned from the internet that the house had burned, and a man was found dead inside.

Once, defendant had asked Etherton if he knew any good pawn shops in Oakland. About a year before Etherton's interview with police, defendant showed Etherton "a bunch of costume jewelry." It included a ring "with a nice center diamond on it." Defendant said he had " 'just found it.' " Etherton said that defendant "[p]ossibly" mentioned a person by the name of Dorothy. Etherton said he did not know any specifics about a situation involving Wiederrich, only that defendant had said he came up on some jewelry and a couple of guns.

Police arrested defendant and Etherton for Gregor's murder on January 12, 2017, the day of the interviews. Wiederrich's homicide was still under investigation. After the arrests, police searched defendant's truck. Inside, they found a rag with defendant's

10

blood on it, but they found nothing they could associate with either homicide. Police also determined that defendant had worked the day of Wiederrich's homicide from 10:30 p.m. on February 12 until 6:30 a.m. the following day.

Katrina searched her truck after the police had searched it. She found some strange things: a pair of large, new bolt cutters and a taser. She thought the taser had been used because it was missing its prongs or connectors. She had never seen defendant carry a taser around or wear it as a security guard. But she recalled seeing it once before in the truck while he was driving.

On April 4, 2017, Etherton's wife, Sandra, reported to police that an inmate had been threatening their family. While a detective met with Sandra at her home, Etherton called. He told the detective he could not speak because there were other inmates around, but they agreed to speak in person at the jail. At the jail, Etherton told the detective that defendant and he had attended a preliminary hearing in this case the day before, and Etherton had learned he would be testifying against defendant. In a holding area after the hearing, defendant told Etherton, " 'I got $10,000 if you take the case.' " Etherton understood that to mean if he pleaded guilty and did all the time for the murder, he would receive $10,000. Etherton told defendant no "because $10,000 wouldn't be enough or isn't worth doing four life sentences."

The two defendants sat next to each other on the bus ride back to jail. Defendant said to Etherton to the effect, " 'It would be a shame if those $10,000 had to be used, or it would be a shame if something happened to your family.' " Etherton did not respond. But at the jail, he called his mother and told her to tell his wife to move out of their house because threats were being made against them. Etherton was subsequently placed in protective custody.

11

<u>Autopsy</u> <u>evidence</u>

Dr. Robert Lawrence, a pathologist for the San Joaquin County coroner's office, performed an autopsy on Wiederrich's body. Wiederrich had suffered multiple stab wounds, and holes in her pajama top corresponded to the wounds. In total, she was stabbed 10 times in her left chest area. Nine of the wounds were potentially lethal, striking her heart, lungs, and aorta.

They were gaping wounds, "quite traumatic appearing." They were concentrated on an area about a foot big and aimed toward the center of her body. She also had defensive wounds on her left hand. The knife twice went through the back of her hand and out the front of her hand. There was also a slash mark on her palm.

The stabbings were applied with a significant amount of force. The wounds had bruising from the assailant's knuckles, indicating "the knife was shoved in hard enough the assailant's knuckles also bruised the body." The knife blade was about an inch and a quarter in width and at least six and a half inches long. Dr. Lawrence could not identify the specific knife used in the murder.

A twisted blue bandanna was forced into Wiederrich's mouth and was tied behind her neck. There were no injuries around her mouth or the back of her neck that would suggest she tried to grab or pull the bandanna off. Bruises encircling her forearms suggested someone had held on to her tight. There was no indication she had struggled when the zip ties were applied to her wrists.

Dr. Bennet Omalu, then chief medical examiner for San Joaquin County, performed an autopsy on Gregor's body. All the surfaces of Gregor's body were burned, but only his extremities exhibited third and fourth degree burns. Gregor had suffered four stab wounds to his left chest over his heart, one stab wound on the right side of his chest below his armpit, and another stab wound behind the neck where the knife was twisted

12

and passed through the neck into the chest.  Gregor also suffered three incise wounds on his neck.

The wounds were "very mutilating" and "destructive."  The stab wound to the right side of the chest was a large gaping wound that showed multiple passes of the knife, some through the chest cavity.  One incise slash wound at the junction of the neck and chest cut through the larynx and into the spine and slashed the larynx with several passes of the knife.  Another slash wound above the first slashed the cartilage of the larynx.  A third slash wound to the right side of the neck extended deep into the base of the mouth from the neck into the tongue and chin.  It cut all the structures at the junction of the head and neck into the floor of the mouth.  Any one of these three slash wounds was sufficient to kill Gregor.

There was no evidence of a struggle or defensive wounds or any attempt by Gregor to sustain his life.  The evidence indicated that more likely than not Gregor was immobilized, being overpowered or overwhelmed.  Dr. Omalu opined that based on the totality of the patterns of trauma, "it is less likely that there was a single perpetrator in this case. . . .  Just based on the evidence, more likely than not, meaning a greater than chance or greater than 50 percent probability that there were two perpetrators."

Dr. Omalu identified the pattern of trauma as overkill.  Overkill occurs when the perpetrator inflicts multiple mutilating and destructive wounds that are unnecessary for killing the victim.  An article in the American Journal of Forensic Medicine and Pathology defined overkill "as a phenomenon in which the multiplicity of wounds far outnumbers that required to cause death.  Elements of such quality release rage[,] and intimate bonds between victim and perpetrator frequently exist."  Overkill frequently occurs "where the perpetrator knows the victim."

Electronic location evidence

The prosecution presented evidence of cell phone communications and location evidence for defendant and Etherton. On February 11, 2016, the day before Wiederrich was murdered, Katrina's cell phone called Wiederrich's phone. The call lasted over 14 minutes. Katrina's next three calls were to an employment attorney.

On February 12, defendant's phone made a call to Etherton's phone at 4:23 p.m. Defendant's phone connected with a cell site in Acampo, and Etherton's connected with a cell site in Lodi. Both sites were under four miles from Wiederrich's residence.

Google Gmail history location data showed that Etherton's Gmail account began making connections around 3:00 p.m. on February 12, 2016, in Stockton, and then around 4:00 p.m. in the Lodi area. From 4:00 p.m. to 4:58 p.m. that day, Etherton's account was in the Lodi area about two and a half miles from Wiederrich's home. There was a break in activity after 4:58 p.m. until 6:19 p.m. when the account began connecting in Stockton for the rest of the evening. There was no Gmail history location data for defendant.

On February 21, 2016, the day before Wiederrich's diamond ring was sold to the Oakland pawn shop, defendant's and Etherton's phones exchanged text messages to arrange to meet the following morning in Stockton. During the next day, February 22, Etherton's and defendant's phones exchanged calls and text messages. At 1:55 p.m., a communication from defendant's phone connected to a cell site in the Alameda area about one and one-half miles from the pawn shop where the ring was sold, and it ended connected to a site about one-half mile from the pawn shop.

On the same day, Etherton's phone connected with cell sites in Stockton, Manteca, Lathrop, and Tracy. Its last connection was at 12:24 p.m. in the Tracy area. Two of the calls were to the pawn shop in Oakland where the ring was sold. Google location history showed Etherton's phone near the Oakland pawnshop from 1:34 to 1:50 p.m. After 2:00

14

p.m., the phone began heading east away from Oakland. It connected in the Tracy area at 3:30 p.m. and the Stockton area at 4:00 p.m. where it stayed through the evening.

Evidence in the Gregor murder included the texts Etherton made to Ryan F., his supervisor, on September 21, 2016, concerning the contact with Gregor. Defendant and Etherton exchanged texts and calls on September 24. On September 25, the day of the fire, defendant's and Etherton's phones exchanged communications five times: two calls in the morning before the fire was reported, and a call and two texts in the evening. At 12:49 p.m. that day, the Gmail account associated with Etherton's phone searched for Gregor's street. It searched for the same address again at 2:32 p.m. as well as a church down the street from Gregor's house.

An e-mail from Etherton's phone showed that someone had used the phone to look for information on zip ties and handcuffs. Also, on the day police released a photo of defendant's truck for help in solving Gregor's murder, Etherton's phone received a text from defendant's phone stating, " 'Come by the house.' " Defendant's and Etherton's numbers were among the four most contacted numbers in each other's phones in a one-year period.

Jailhouse informant testimony

Four jailhouse informants testified against defendant: Ronnie B., Roy R., James F., and Timothy A. Ronnie B. has been in custody at times for various drug offenses, burglary, and other crimes. After meeting with police on this matter, Ronnie requested their help to get him out of jail. Ronnie also worked as an informant in three prior cases.

Ronnie and Etherton were both housed in the county jail in 2017 and 2018. During that time, Etherton explained the details of the Gregor murder to Ronnie. Etherton said that on "the 25th," he and his friend "Ken" were looking to commit a robbery. They went into Gregor's house. Gregor and defendant got into an argument,

15

and defendant tased Gregor. Etherton walked out, and defendant walked out about 15 minutes later carrying bloody clothing, marijuana, and other property from Gregor's house. Etherton told Ronnie that Gregor had been stabbed in the neck three times and once on his side, and that a fire had been set using lacquer to cover up the evidence.

Etherton also told Ronnie about selling a $14,000 ring to a pawnshop in Oakland. Etherton said the ring was connected to a murder defendant had committed in Valley Springs. They had gone to Oakland, and Etherton pawned the ring. Etherton wanted Ronnie to buy the ring when Ronnie got out of jail because Etherton knew it would connect him and defendant to the murder. Etherton wrote down his involvement in the crimes, and Ronnie gave the document to police.

Roy R. was serving a prison sentence for child sexual assault and cruelty. He underwent a competency trial in his case. Before prison, Roy was housed at the county jail for a time, and he met Etherton there. Etherton told him that he and another person had tied up an old woman in Lodi, stabbed her to death, set her on fire, and robbed her. Etherton also told him of another murder that occurred while he was selling vacuums. The victim was waiting on a settlement, and at some point Etherton stabbed the man in his back and his side. Etherton said the man was a drunk and he deserved it.

James F. was in prison for attempted intimidation of a witness and having sex with a child. He and defendant were cellmates twice in county jail. Defendant told James he was in custody for double murder. "Kevin" had called defendant to plan a robbery of a man he had met selling Kirby vacuums. The man was coming into some money. The plan was for Kevin to act like he was going to sell a vacuum, and defendant would come in behind him. They went to the house in defendant's truck. When the victim started asking who defendant was, they attacked him. Kevin came from behind, and while he held the man down, defendant stabbed the man numerous times in the back, the throat, and under his arm with a knife.

16

Timothy A. was in county custody for probation violations.  He had previously been convicted of burglary and for passing bad checks.  Timothy was in custody with defendant for a few weeks in 2018.  He overheard defendant speak with a man called Beast, and he heard about a lady with a ring who used to help out defendant and his wife, the name Dorothy, that a ring was taken from her, the knife used to kill her came from the kitchen island, something like a .22 gun had been taken from the house, and defendant's wife knew the lady well.  Beast did most of the talking.  Timothy heard someone in the conversation say defendant's wife went to the door to get him in.  Timothy also heard defendant and Beast talk about a second murder involving the sale of a Kirby vacuum cleaner to the victim.  Defendant went in and ended up killing the person and lighting either the couch or the body on fire.

## II

### *Defense*

Defendant testified at his trial.  He stated he had no part in Wiederrich's murder, including its planning.  He denied knowing the code to Wiederrich's door.  He admitted going to the pawn shop in Oakland with Etherton, but he denied knowing that Etherton was selling Wiederrich's ring.

As for the Gregor murder, defendant admitted driving Etherton to Gregor's home in his truck.  Etherton had told him he had a customer in Lodi, and he directed defendant to Gregor's home.  Defendant said he waited in the truck while Etherton knocked on the door.  When no one answered, Etherton began using his cell phone.  At that point, defendant disregarded Etherton and began playing a game on his own cell phone.  He was high from smoking marijuana.  When he looked up, he saw Etherton walking towards the truck.  Etherton got in, and they drove away.  Defendant did not see any blood on Etherton or any smoke, but Etherton seemed subdued.  In a phone call to his wife from

17

jail, defendant stated he had deduced that Etherton had gone inside the house and killed the person.

Dr. Katherine Raven, a forensic pathologist, testified for the defense. Dr. Raven criticized much of Dr. Omalu's testimony. Among other things, she criticized his use of the term "overkill." She said the term is used if at all in forensic psychiatry. She has never professionally used that term. The term is not medical terminology and is irrelevant to describing the cause of death. Dr. Raven believed much of Dr. Omalu's testimony was outside the scope of a forensic pathologist.

Dr. Raven also criticized Dr. Omalu's conclusion that Gregor's wounds were inflicted by two people, and that one of the persons incapacitated Gregor. In her opinion, there was no way to tell from the autopsy or photographs whether there was one or more than one perpetrator. There also was no way to determine from the evidence whether Gregor had been incapacitated.

A number of witnesses testified to Etherton's character, including Etherton's wife, Sandra. Sandra stated Etherton had not come home wearing different clothes than the ones he left in, nor had he come home with blood on his clothes. He also had not come home with jewelry she did not recognize. Sandra also testified that she and Etherton were exploring options related to their intimate relationship to try to fix their marriage, and as part of that they searched online for handcuffs to use.

III

*Verdict and Sentence*

A jury found defendant guilty of two counts of first degree murder with robbery, burglary, and multiple-murder special circumstances. It also found him guilty of first degree robbery, second degree robbery, two counts of first degree burglary, and arson of an inhabited structure. (Pen. Code, §§ 187, subd. (a); 190.2, subd. (a)(17)(A), (a)(17)(G),

18

(a)(3); 459; 211; 451.)  The trial court found true allegations that defendant had two foreign prior strike convictions.

The trial court sentenced defendant to a total prison term of 25 years to life plus life without parole, calculated as follows:  25 years to life on the arson count, plus consecutive terms of life without parole on the two murder counts.  The court imposed terms of 25 years to life on the remaining counts, but it stayed execution under Penal Code section 654.

DISCUSSION

I

*CALCRIM No. 376*

Possession of recently stolen property is so incriminating it may warrant conviction of theft related offenses where there is additional slight evidentiary corroboration of the defendant's guilt.  (*People v. McFarland* (1962) 58 Cal.2d 748, 754.)  The intent to steal, the defendant's identity, and the determination that the defendant committed acts constituting theft crimes such as robbery and burglary "naturally and logically flow" from evidence of conscious possession of stolen property and corroborating evidence.  (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1176, fn. 6.)

This rule, however, does not apply to nontheft offenses such as murder or rape.  (*People v. Prieto* (2003) 30 Cal.4th 226, 249 (*Prieto*).)  Proof that a defendant was in conscious possession of recently stolen property by itself "simply does not lead naturally and logically to the conclusion the defendant committed a murder[.]"  (*People v. Barker, supra*, 91 Cal.App.4th at p. 1176.)

CALCRIM No. 376 is the instruction currently used to instruct juries on this rule.  Over defendant's objection, the trial court instructed the jury with CALCRIM No. 376.  In giving the instruction, the court told the jurors that if they concluded defendant knew he possessed recently stolen property and that other supporting evidence tended to prove

19

his guilt, they could conclude the evidence was sufficient to prove defendant "committed Counts 5 through 7" of the information. Count 5 charged defendant with Wiederrich's murder. Count 5 also alleged as special circumstances that the murder was committed while defendant engaged in committing burglary and robbery. (Pen. Code, § 190.2, subd. (a)(17)(A), (G).)

Defendant contends the trial court erred by applying CALCRIM No. 376 to the murder count. The instruction allowed the jury to find defendant guilty of murder based on the claim he possessed the ring recently stolen from Wiederrich, a claim defendant also disputes. Defendant argues the instruction, in violation of his due process rights, lowered the prosecutor's burden of proving murder. He contends the error requires reversal under the *Chapman*[1] constitutional harmless error standard of review as well as the *Watson*[2] standard for state law error.

The trial court erred by instructing with CALCRIM No. 376 that possession of stolen property could with only slight corroboration create an inference that defendant was guilty of murder. (*People v. Gamache* (2010) 48 Cal.4th 347, 375.) Although count 5 also alleged burglary and robbery special circumstances, the jury instruction related to the murder charge, not the special circumstance allegations. (See *People v. Harden* (2003) 110 Cal.App.4th 848, 856 [instruction may be given for theft-related murder special circumstances].)

Contrary to defendant's argument, however, the error is not of federal constitutional magnitude. Ruling on CALCRIM No. 376's predecessor, CALJIC No. 2.15, the California Supreme Court has consistently held that the instruction does not reduce the prosecution's burden of proof in violation of due process. (*People v. Moore*

---

[1]     *Chapman v. California* (1967) 386 U.S. 18, 24.

[2]     *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

(2011) 51 Cal.4th 1104, 1131-1133 (*Moore*); *People v. Gamache, supra*, 48 Cal.4th at p. 376; *Prieto, supra*, 30 Cal.4th at p. 248; see *People v. Westerfield* (2019) 6 Cal.5th 632, 710-711.) The instruction "did not directly or indirectly address the burden of proof, and nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt." (*Prieto,* at p. 248.) The instruction also does not create an improper inference under the federal Constitution. (*Moore*, at pp. 1131-1132.)

In *Moore*, the California Supreme Court addressed a situation like the one here. There, the trial court instructed the jury with CALJIC No. 2.15, stating the jury could infer the defendant was guilty of "the crimes charged" if it found the defendant was in possession of recently stolen property and that slight corroborating evidence tended to prove the defendant's guilt. One of the crimes charged was murder. (*Moore, supra*, 51 Cal.4th at p. 1130.) The Supreme Court held the trial court had erred, but the error did not lower the prosecution's burden of proof. "The jury was instructed it could draw merely 'an inference of guilt' from the fact of possession with slight corroboration, which any rational juror would understand meant he or she could consider this inference in deciding whether the prosecution has established the elements of murder (and the other offenses) elsewhere defined in the trial court's instructions. The instruction purported to explain to the jury its proper consideration of a particular item of circumstantial evidence in reaching a verdict on the charges; it did not alter the defining elements of those charges." (*Id*. at p. 1131.)

Additionally, other instructions correctly informed the jury of its duty to weigh the evidence, what evidence it could consider, how to weigh that evidence, and the burden of proof. (*Moore, supra*, 51 Cal.4th at p. 1133.) As the high court had previously stated, "In light of these instructions, there is 'no possibility' CALJIC No. 2.15 reduced the prosecution's burden of proof in this case." (*Prieto, supra*, 30 Cal.4th at p. 248.) This reasoning applies equally to CALCRIM No. 376.

In fact, CALCRIM No. 376 makes the prosecution's burden explicit. The instruction as drafted and as given by the trial court includes the following statement: "Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt." Even if defendant possessed Wiederrich's ring, the jury could find him guilty of first degree murder only if the prosecution established each element of that crime beyond a reasonable doubt.

Because the instruction did not affect the burden of proof, we review the error for prejudice under the *Watson* standard of review. (*Moore, supra*, 51 Cal.4th at p. 1133.) We are required to affirm a jury verdict despite instructional error if the error was harmless. (*People v. Hendrix* (2022) 13 Cal.5th 933, 941.) Applying the *Watson* standard, we examine the record to determine whether it is reasonably probable defendant would have received a more favorable outcome had the error not occurred. (*Watson, supra*, 46 Cal.2d at p. 836.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) While we undertake this task considering the " ' "entire cause, including the evidence," ' " we "focus solely on whether 'the error affected the outcome,' " not on whether we personally believe the outcome was correct. (*People v. Hendrix, supra*, 13 Cal.5th at p. 948.)

We conclude it is not reasonably probable the jury would have reached a different result had the trial court not applied CALCRIM No. 376 to count 5. As just explained, even if the jury considered defendant's possession of the ring pursuant to CALCRIM No.

22

376, the instruction still required the jury to determine whether the prosecution had established each element of first degree murder beyond a reasonable doubt. The other instructions informed the jury of the elements of murder, the standard of proof, and the requirement that each element had to be proven by the prosecution beyond a reasonable doubt. There is no evidence the jury did not follow the instructions.

Additionally, the evidence supporting the verdict is sufficiently strong such that there is no reasonable probability the instructional error affected the result. Defendant knew Wiederrich, and he learned about her diamond ring and its value from Katrina. He had gone with Katrina a number of times to Wiederrich's home. Katrina accessed the home by entering the door code. The jury could reasonably infer that defendant gained knowledge of the door code by watching Katrina input the code. Unbeknown to Katrina, defendant had gone to Wiederrich's home by himself a few times, claiming to Wiederrich he had to drop something off or pick something up for Katrina. But Katrina testified she never sent defendant to Wiederrich's home to drop something off or pick something up.

Defendant was upset with Wiederrich. She had terminated Katrina's employment, and he wanted to confront her about it. On February 12, 2016, defendant's phone made a call to Etherton's phone at 4:23 p.m., slightly more than two hours before the time police believe Wiederrich was murdered. Defendant's phone connected with a cell site in Acampo, and Etherton's connected with a cell site in Lodi. Both sites were under four miles from Wiederrich's home. From 4:00 p.m. to 4:58 p.m. that day, Etherton's Google Gmail account was in the Lodi area about two and a half miles from Wiederrich's home.

On the day after the murder, Katrina noticed that defendant's hand had skin tears and "was pretty scratched up, beat up." A few days later, Amber noticed that defendant had a large sore on his right forefinger that looked as if he had rubbed a blister raw. The jury could reasonably infer that defendant's hand injuries were related to Wiederrich's murder.

23

The jury reasonably inferred that defendant possessed Wiederrich's diamond ring after the murder. Wiederrich always wore the ring, and it was missing after she was killed. On February 21, 2016, the day before Wiederrich's diamond ring was sold to the Oakland pawn shop, defendant's and Etherton's phones exchanged text messages to arrange to meet the following day in Stockton. During the next day, February 22, while Etherton was at the pawnshop in Oakland pawning Wiederrich's ring, defendant's phone was close by, connecting to a cell site in the Alameda area about one and one-half miles from the pawn shop and ending its connection with a different cell site about one-half mile from the pawn shop. The jury reasonably inferred that defendant possessed and participated in selling the ring.

While the jury could not rely only on defendant's possessing the ring and other slight corroborating evidence to infer defendant's guilt, it certainly could consider the evidence as circumstantial evidence showing defendant was " 'present and concerned' " in the offense. (*Moore, supra*, 51 Cal.4th at p. 1132, quoting *Wilson v. United States* (1896) 162 U.S. 613, 619-620.) " 'Proof that defendant had in his possession, soon after, articles apparently taken from the deceased at the time of his death is always admissible, and the fact, with its legitimate inference, is to be considered by the jury along with the other facts in the case in arriving at their verdict.' " (*Moore*, at p. 1132.)

All this corroborating evidence was sufficient to justify the jury relying on the jailhouse informants' testimonies and Etherton's statement to the police to find defendant guilty of murdering Wiederrich. Roy R. testified that Etherton told him he and another person tied up an old lady in Lodi, stabbed her to death, set her on fire, and robbed her.

Timothy A. overheard defendant speaking with Beast, and he heard about a lady with a ring who used to help defendant and his wife, the name Dorothy, that a ring was taken from her, the knife used to kill her came from the kitchen island, something like a .22 gun had been taken from the house, and defendant's wife knew the lady well.

24

Ronnie B. testified that Etherton told him about selling Wiederrich's ring to a pawnshop in Oakland. Etherton said the ring was connected to a murder defendant had committed. Etherton wanted Ronnie to buy the ring when Ronnie got out of jail because he knew it would connect him and defendant to the murder.

In his statement to police, Etherton said that defendant had asked him if he knew any good pawn shops in Oakland. About a year before Etherton's interview with police, defendant showed Etherton "a bunch of costume jewelry" and a couple of guns. It included a ring "with a nice center diamond on it." Defendant said he had " 'just found it.' " Etherton said that defendant "[p]ossibly" mentioned a person by the name of Dorothy.

In opposition, defendant mostly attacks the credibility of the jailhouse informants' testimony, an issue we do not address on appeal. He also contends that Ronnie's testimony was double hearsay and should not have been admitted, and that Dr. Omalu testified to areas outside his expertise. We will address those arguments separately below. But mostly defendant contends the direct evidence implicates Etherton more than himself, and that the informants' testimonies were primarily based on statements and directions they received from Etherton.

Other than defendant's testimony, however, there is no evidence that contradicts the statements of facts made by the informants concerning defendant and his involvement in Wiederrich's murder. Thus, even if the jury had not been instructed with CALCRIM No. 376 as to the murder count, the evidence establishes that it is not reasonably probable defendant would have obtained a more favorable outcome had the court not applied CALCRIM No. 376 to the murder count. The error was harmless.

25

*Ineffective Assistance of Counsel Regarding Ronnie B.'s Testimony*

In general, an extrajudicial testimonial statement by a codefendant that implicates the defendant may not be admitted at trial. (*People v. Aranda* (1965) 63 Cal.2d 518, 530-531; *Bruton v. United States* (1968) 391 U.S. 123, 132-137 (collectively *Aranda/Bruton*).) But the failure to object at trial on *Aranda/Bruton* grounds forfeits the claim of error on appeal. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1044.)

Defendant contends his trial counsel rendered ineffective assistance when he did not object on *Aranda/Bruton* grounds to informant Ronnie B.'s testimony regarding incriminating statements made by codefendant Etherton. Defendant argues that although he waived his objections under *Aranda/Bruton* to a number of out-of-court statements, he did not waive the objection to Etherton's statements that were reported by Ronnie. Yet the trial court determined, and defense counsel agreed, that defendant had in fact waived the objection, and the evidence was admitted. Defendant argues the evidence should have been excluded under *Aranda/Bruton*, and his trial counsel rendered ineffective assistance by not recognizing that defendant had not waived the objection and by not objecting on that ground.

A.  Background

Before trial, the prosecution moved in limine to admit a number of extrajudicial statements defendant and Etherton had made since their arrests. One of the statements, statement no. 5 in the prosecutor's motion, was Etherton's statement to police on January 12, 2017, about defendant's involvement in Gregor's murder. Etherton said that, when defendant left the house, he came out covered in blood holding a bag with various items, including good marijuana. Another statement, no. 16 in the motion, was Etherton's statement to informer Ronnie B. while the two were incarcerated.

The prosecution also filed a separate motion in limine to admit statements by Etherton where he attempted to suppress evidence. The motion sought to admit requests by Etherton that Ronnie go to Oakland and obtain Wiederrich's ring that Etherton had pawned, that Ronnie testify against defendant, and that Ronnie look into having someone kill defendant. The motion also sought to admit evidence that Etherton wanted to set up a scenario where it looked like defendant was threatening Etherton's family.

At the hearing on the motions in limine, the court stated it would not rule on the "statements of defendants" at that hearing but would rule on it at the next hearing. It addressed the motion regarding Etherton's attempts to suppress evidence. Asked to respond to the motion, defendant's attorney, Mr. Humphrey, stated, "This particular motion in limine really goes to the crux of our defense, and, you know -- you know, some of the conduct from Mr. Etherton since he was arrested certainly tend[s] to exonerate [defendant]. We would ask that the Court allow all of [Ronnie]'s testimony to be heard by [defendant's] jury. And so we agree with [the prosecutor] in this particular issue."

The prosecutor stated the issue "gets kind of convoluted" because Ronnie also talked about information he obtained from Etherton that incriminated defendant, and those statements would be addressed in the in limine motion on statements. The court asked Mr. Humphrey, "[A]re you objecting to any of [Ronnie]'s statements?" Counsel replied, "No."

At the next hearing, the trial court announced it had read the statements by Ronnie that the prosecution sought to admit. The court stated, "My understanding from last week is that [defendant] -- and, Mr. Humphrey, that you're not objecting to [Ronnie B.'s] statements coming in?" Humphrey replied, "That's right, Your Honor."

The court then addressed defendant directly. It explained that some of Ronnie's testimony of Etherton's statements would be admissible under Evidence Code section 1220 as statements by a party opponent. More significantly, Ronnie's testimony of

27

Etherton's statements that incriminated defendant would under *Aranda/Bruton* not be admitted if Etherton chose not to testify unless defendant waived the objection.

The court also explained that if defendant waived his objection under *Aranda/Bruton*, he also waived any claim of ineffective assistance of counsel on appeal due to Mr. Humphrey's not objecting to the evidence. The court stated, "[I]n those statements Mr. Etherton refers to you and things he says that you did. If you object -- and I don't know if there's a different theory [the prosecutor] has, but generally if you objected to that it wouldn't come in because you can't cross-examine Mr. Etherton. And what I'm saying is because you're telling through your attorney last week that you want that statement in, basically you're waiving that, you're waiving any kind of defects. You're also waiving ineffective assistance of counsel."

Defendant stated it was his understanding that Etherton intended to testify. The court said defendant could not rely on that. Defendant then said he would need to speak with his attorney. It seemed to him that Etherton confessed to Ronnie that Etherton had been lying about defendant and trying to blame everything on defendant. The court stated, "I just need to know -- at some point I need to know are you objecting to this testimony or are you not objecting. And if you're not objecting, I just need to have a clear record that you're not objecting and you completely understand it, and it sounds like you do."

Mr. Humphrey stated that he and defendant had discussed this issue and its importance "many, many times." The issue was coming into the strategy side of things where there may be an advantage" for defendant to waive the objection, and defendant believed there was an advantage. Coming into court that morning, it was Humphrey's understanding that defendant was prepared to waive the objection. But because defendant had asked for more time, Humphrey asked the court to continue the matter to the following day.

28

The next day, the court announced it was back to addressing the prosecution's motion to admit statements made by the defendants. The court ruled on each statement the prosecution sought to admit. As for the motion's statement no. 5, Etherton's statement to the police, Mr. Humphrey said he and defendant were "in a similar posture as we were yesterday with [defendant] personally waiving, you know, any hearsay exceptions of the statement. I think [defendant] wants this statement to come into his trial." Humphrey asked the court to obtain a personal waiver from defendant. Defendant clarified with the court that he was waiving "on this one evidentiary issue," and he waived his objections to that statement only. In similar fashion, the court obtained individual waivers by defendant to a number of statements the prosecution sought to admit.

When the court turned to statement no. 16, Etherton's statements to Ronnie, the discussion proceeded as follows:

"[THE COURT:] Okay. Then you were mentioning, [prosecutor], 16 references what we had previously ruled on?

"[THE PROSECUTOR]: Yes, was my understanding. I think you went through everything on it yesterday.

"THE COURT: Right.

"[THE PROSECUTOR]: The good, the bad.

"THE COURT: So I previously ruled this was coming in by a statement by a party opponent. And [defendant] previously did not object to this statement. Anything else that anyone wants to put on the record with regard to 16?

"[¶] . . . [¶]

"MR. HUMPHREY: No. I think the Court ruled on this already.

"THE COURT: Okay. All right. So that statement will come in before both juries."

29

Etherton did not testify at trial. As stated above, Ronnie testified to Etherton's incriminating statements against defendant. During Ronnie's testimony, defendant did not object to the evidence under *Aranda/Bruton* or the confrontation clause.

B.  Analysis

To establish a claim of ineffective assistance of counsel, defendant must show counsel's performance was deficient because it " 'fell below an objective standard of reasonableness under prevailing professional norms.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) Defendant must also show " 'resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*Ibid.*) Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact we review independently. (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

As to the reasonableness of counsel's performance, we presume the performance " ' "fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125.) Defendant's burden to overcome this presumption is difficult to carry on direct appeal because the record often does not disclose the reason for counsel's action. (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) For that reason, we may reverse only if " '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*People v. Hoyt, supra*, 8 Cal.5th at p. 958.)

As for the prejudice requirement, a defendant must establish prejudice as a " 'demonstrable reality,' not simply speculation" as to the effect of counsel's errors or omissions. (*People v. Williams* (1988) 44 Cal.3d 883, 937.) We may reject a claim of

ineffective assistance for lack of prejudice without addressing whether counsel's performance was deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Defendant has not established that his trial counsel's performance fell below an objective standard of reasonableness. The record indicates counsel did not object to Ronnie's testimony under *Aranda/Bruton* as a matter of reasonable trial strategy. Defendant's defense was that he was innocent, Etherton was guilty, and Etherton had gone to great lengths to implicate defendant falsely through statements to others. Responding to the prosecution's in limine motion to admit Etherton's statements to Ronnie attempting to suppress evidence, defense counsel stated the motion went to "the crux" of defendant's defense. Counsel believed Etherton's conduct tended to exonerate defendant, and he twice informed the court that defendant did not object to any of Ronnie's testimony.

After the trial court fully explained to defendant the consequences of waiving his *Aranda/Bruton objection*, defense counsel stated he and defendant had discussed the issue "many, many times," and that from the point of strategy, defendant believed there was an advantage to waive the objection. Defendant requested more time to speak with counsel, and the following day, both the court and counsel mistakenly agreed that defendant had formally waived his objection to statement no. 16. But at no time during Ronnie's testimony did counsel object on the basis of *Aranda/Bruton*.

Consistent with his defense and trial strategy, defendant waived his *Aranda/Bruton* objection to other incriminating statements made by Etherton. Defendant waived the objection to Etherton's statement to the police "blaming" defendant for Gregor's murder. He waived the objection to a request by Etherton to a sheriff's deputy that they investigate whether defendant was threatening him. He waived the objection to Etherton's statements to Roy incriminating himself in both murders and incriminating defendant in Wiederrich's murder. Defendant also waived the objection to Timothy's incriminating testimony.

31

In cross examining Ronnie, defense counsel pursued the defense that Etherton's statements falsely implicated defendant. He asked Ronnie whether Etherton had wanted Ronnie to make defendant "the fall guy" and had wanted Ronnie to help in killing defendant. Ronnie said yes to both questions. Counsel asked Ronnie whether Etherton had tried to minimize his involvement in the murders at defendant's expense. Ronnie said yes. Counsel asked whether Etherton wanted Ronnie to lie and inform the police that defendant was the one who gave him all of his information in order to put all the blame on defendant. Ronnie said yes.

Defense counsel pursued the same line of defense in his closing argument. He stated the case was about "the manipulator, the exaggerator, and the fall guy." Counsel said defendant's defense is that he did not do it and is innocent. The manipulator was Etherton who manipulated or attempted to manipulate each witness. Counsel described how Etherton had manipulated his family, the informants, and the police to make defendant the "fall guy."

Counsel also reviewed Ronnie's testimony. He recited 10 instances where Etherton had manipulated Ronnie to direct blame at defendant and suppress defendant from testifying. After reviewing the evidence, counsel asked the jury to consider whether Etherton's manipulative behavior was consistent with someone who is innocent. The testimony of Ronnie which defense counsel reviewed is the very evidence defendant would have excluded had he objected to it under *Aranda/Bruton*. The record discloses that defense counsel did not object to Ronnie's testimony due to a reasonable trial strategy.

To the extent counsel's performance was not reasonable due to his mistakenly believing defendant had in fact waived the objection, the error was not prejudicial. The record indicates defendant would have formally waived the objection if given the opportunity, and Ronnie's testimony would still have been admitted. Defendant thus has not established ineffective assistance of counsel.

32

III

*CALCRIM No. 371*

A defendant's willful or attempted suppression of adverse evidence is admissible to prove consciousness of guilt. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007; Evid. Code, § 413.) CALCRIM No. 371 instructs a jury on this point. But before a trial court may instruct a jury on inferring a consciousness of guilt from a defendant's suppression of evidence, " 'there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference.' " (*People v. Hart* (1999) 20 Cal.4th 546, 620.)

Defendant contends the trial court erred in instructing his jury with CALCRIM No. 371 because no substantial evidence supported giving the instruction.

A.      Background

During discussions on jury instructions, the prosecutor requested the court instruct both juries with CALCRIM No. 371. The trial court put on the record the evidence the prosecutor relied on for seeking the instruction: "evidence that the ring was pawned, also evidence of letters written and attempts to be made as far as threats against a co-defendant or threats against a co-defendant's family."

Upon clarifying that the prosecutor sought the instruction for both juries, defendant's counsel objected. Etherton's counsel neither objected nor consented. She stated, "I believe there was testimony that [defendant] attempt[ed] to have Mr. Etherton taken out so he couldn't testify, and that he was mad at Mr. Etherton for making the statements that implicate [defendant]." Etherton's counsel submitted the matter without objection.

The trial court found there was substantial evidence to justify giving the instruction to both juries. The court instructed defendant's jury with CALCRIM No. 371 as follows: "If a defendant tried to hide evidence or discourage someone from testifying

against him, that conduct may show that he was aware of his guilt. If you conclude that a defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.

"If a defendant tried to create false evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude a defendant made such an attempt, it is up to . . . you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself.

"If you conclude that a defendant tried to hide evidence, discourage someone from testifying, or authorize another person to hide evidence or discourage a witness, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty."

B.      Analysis

Defendant contends the evidence did not support giving the instruction to his jury. He asserts the prosecutor did not refer to any evidence that supported giving the instruction. Defendant also claims the record shows that Etherton's counsel's recitation of the facts was incorrect. It was Etherton who asked Ronnie to find a way to kill defendant, not that defendant threatened to kill Etherton. And defendant's being "mad" at Etherton does not show he suppressed any kind of evidence. Further, by relying on Etherton's counsel's factual assertions, the trial court permitted the jury to infer defendant's guilt based on evidence not related to guilt in violation of due process.

Whether any set of facts may constitute suppression of evidence from which a jury can infer a defendant's consciousness of guilt is a question of law we review de novo. (*People v. Hart, supra*, 20 Cal.4th at p. 620.) To justify the instruction, "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)

Substantial evidence in the record supported the trial court instructing defendant's jury with CALCRIM No. 371.  Defendant participated with Etherton in pawning Wiederrich's ring.  Additionally, there was evidence that defendant threatened Etherton and his family.  Etherton told detectives that after learning at a hearing he would be testifying against defendant, defendant offered him $10,000 if he would plead guilty and do all the time for the murder.  On the bus ride back to jail, defendant threatened Etherton by saying in effect, " 'It would be a shame if those $10,000 had to be used, or it would be a shame if something happened to your family.' "  This evidence showed that defendant attempted to create false evidence and threatened Etherton against testifying.

Defendant incorrectly asserts that the prosecutor did not refer to any evidence that supported giving the instruction to his jury.  The trial court put on the record the evidence the prosecutor was relying on, including the pawning of the ring and threats "against a co-defendant," and the prosecutor sought the instruction for both juries based on that evidence.  That evidence justified giving the instruction to defendant's jury.

That Etherton's counsel may have misrepresented the facts to support the instruction is of no moment.  The prosecutor requested the instruction for both juries based on facts that involved both defendants, individually and collectively.  At issue is whether substantial evidence supported giving the instruction to defendant's jury, and we have found there was sufficient evidence.  The trial court did not err in giving CALCRIM No. 371 to defendant's jury.

IV

*Dr. Omalu's Testimony*

A person is qualified to testify as an expert witness if the person has special knowledge, skill, experience, training, or education sufficient to qualify the person as an expert on the subject of his or her testimony.  (Evid. Code, § 720, subd. (a).)  An expert witness's opinion must relate to a subject that is beyond common experience and be

35

based on matter perceived or personally known that reasonably may be relied upon to form an expert opinion.  (Evid. Code, § 801.)

Defendant contends the trial court abused its discretion when it determined that Dr. Omalu was qualified to render an expert opinion on forensic epidemiology as it related to these homicides, specifically that two perpetrators committed Gregor's murder and that Wiederrich knew her assailants.

A.    Background

Dr. Omalu performed the autopsy on Gregor's body.  He also was the pathologist on the scene of Wiederrich's murder.  Before trial, defendant objected to Dr. Omalu being allowed to testify to anything outside of his actual experience or beyond the cause of death.  Counsel argued that at the preliminary hearing, Dr. Omalu testified that, for example, the evidence showed there were two perpetrators, the victim knew the defendants, and that Dr. Omalu was able to determine the weapons the defendants had used.  Counsel argued this testimony was "far afield" from that to what Dr. Omalu should be able to testify.

The prosector argued that all of Dr. Omalu's testimony was based on his expertise. Dr. Omalu is a forensic pathologist, a clinical pathologist, a neuropathologist, an anatomic pathologist, and a forensic epidemiologist.  The prosecutor asserted that all of Dr. Omalu's testimony was relevant and should be admitted.

The trial court reserved ruling on the objection.  The prosecution subsequently filed a motion in limine to allow Dr. Omalu to testify to his expertise and to the matters he testified to at the preliminary hearings.

When the trial court returned to the issue, it reviewed the portions of Dr. Omalu's preliminary hearing testimony that defendant had argued in his in limine motion were objectionable, and it ruled which testimony would be admissible at trial.  In general, the court allowed Dr. Omalu to testify based on his expertise, but he could not express

36

opinions that went to the perpetrator or perpetrators' intent or whether the victims knew their assailants.

Of relevance here, the court ruled that regarding Gregor's murder, Dr. Omalu could testify that it was more likely than not that Gregor was killed by more than one person. Dr. Omalu could also testify in general about the concept of overkill and that in many instances involving overkill the assailants know the victim, but he could not speculate whether in these cases the assailants knew their victims or in Wiederrich's murder that the victim and the assailant or assailants were not complete strangers.

## B. Analysis

Defendant challenges three portions of Dr. Omalu's testimony. He contends there was no basis to allow Dr. Omalu to testify as an expert regarding epidemiology as it relates to homicide or the mindset of perpetrators. Defendant also contends Dr. Omalu's expertise did not allow him to testify that two perpetrators were involved in Gregor's murder. Additionally, defendant contends Dr. Omalu went beyond the court's ruling allowing him to testify in general on the ramifications of overkill but not that Wiederrich knew her assailant.

We review a claim that the trial court improperly admitted expert opinion evidence for an abuse of discretion. (*People v. Hoyos* (2007) 41 Cal.4th 872, 910, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " 'clearly lacks qualification as an expert.' " ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 162.)

### 1. Epidemiology

Defendant claims Dr. Omalu's expertise and skillset did not include assessing the mindset of persons who committed homicides within the framework of an epidemic. Defendant argues that Dr. Omalu's attempt to classify two stabbing homicides as an

epidemic is beyond the reach of what is commonly understood as an epidemic. Dr. Omalu defined epidemiology as a specialty of medicine regarding the causes, spread, and distribution of diseases and the interconnectivity of disease in populations, not, as defendant argues, in a single patient. The examples he used to explain the subject—a hypothetical outbreak of syphilis and a study by Dr. Omalu involving 17,000 subjects to ascertain the suicide rate of bariatric surgery patients—indicate epidemiological studies involve far more people than two to create a reliable conclusion. "In other words, an epidemic refers to a disease that is widespread." Epidemiology was not applicable to the two murders at issue.

Defendant has not established that Dr. Omalu was not qualified to testify on matters of forensic epidemiology. Dr. Omalu is board certified in five medical subspecialities: anatomic pathology, clinical pathology, forensic pathology, neuropathology, and medical management. His training includes completing a three-year program in epidemiology which led to a master's degree in public health in epidemiology. The trial court thus did not abuse its discretion by admitting his testimony on matters of forensic epidemiology.

Defendant also misstates Dr. Omalu's testimony. Dr. Omalu did not assess the defendants' mindsets within the framework of an epidemic, nor did he classify the two murders as an epidemic. Dr. Omalu explained how he uses epidemiology in his work as a pathologist. In general, even though the cause of a disease may be unknown, epidemiologists can determine the risk factors associated with the disease. Knowing how diseases behave among populations, epidemiologists can apply that statistical information and those theories to an individual patient. Departments of health, for example, practice epidemiology to protect individuals.

Dr. Omalu testified that he uses forensic epidemiology in a similar fashion to help determine the mechanisms of a person's death. He relies on epidemiological data and patterns to assist in determining the cause and manner of death. For example, in another

case, skeletal remains of a missing man were found which included a relatively intact skull. The skull had a bullet hole. At issue was whether the person was killed or committed suicide. The person was a 32 year old white male who had played college football and was suffering from and being treated for depression. Epidemiological data indicated that more likely than not, such a person committed suicide. That information led to finding a gun close to the site where the person was shot.

Based on his observations that both Wiederrich's and Gregor's murders exhibited signs of overkill, Dr. Omalu for purposes of answering epidemiology questions obtained information on how many homicides and stab wound cases had occurred in Lodi. Since 2000, there had been no multiple stab wound cases until 2016, when there were these two cases within seven months. Since then, there had been no multiple stab wound cases. In Dr. Omalu's opinion, the two incidents were sentinel cases, and the fact that no further cases occurred indicated the source of the sentinel cases had left Lodi or was no longer in Lodi.

The evidence does not establish that Dr. Omalu clearly lacked qualification as an expert in forensic epidemiology or the manner in which he utilized that knowledge, or that his use of forensic epidemiology was irrelevant. Defendant has thus not established that the trial court abused its discretion in admitting Dr. Omalu's testimony based on forensic epidemiology.

### 2. Number of perpetrators in Gregor's murder

Defendant claims Dr. Omalu's expertise did not allow Dr. Omalu to testify that two perpetrators were involved in Gregor's murder. Dr. Omalu testified there was no evidence that Gregor defended himself or attempted to save his life. This meant he more likely than not was immobilized by being overpowered or overwhelmed during the attack. The evidence indicated to Dr. Omalu it was less likely than not that there was only one perpetrator, and more likely than not that there were two perpetrators.

39

The trial court did not abuse its discretion admitting the testimony. The court found the testimony was based on what Dr. Omalu had observed of the wounds and their nature and location, as well as his training, experience, and review of the scientific literature. The opinion was relevant and not based on speculation.

Defendant contends the trial court abused its discretion admitting the testimony because Gregor's lack of defense wounds could be explained by other possible causes, such as being incapacitated by a taser, alcohol, or an initial debilitating blow with a knife. While other potential causes for Gregor's lack of defense wounds may exist, that possibility did not disqualify Dr. Omalu from testifying to his expert opinion. He even acknowledged that another doctor could review his autopsy report and come to different conclusions. Defendant's expert witness, Dr. Raven, did just that and testified there was no way to tell from the evidence whether there had been more than one perpetrator or whether Gregor had been incapacitated. Both expert opinions were relevant and admissible, and the jury would decide which or if either opinion was credible.

### 3. Overkill

Defendant contends Dr. Omalu went beyond the trial court's ruling that he could opine in general on the ramifications of overkill but could not opine that Wiederrich knew her assailant. Dr. Omalu testified that upon arriving at Wiederrich's home, he "opined that based on epidemiologically the perpetrator knew the victim because I immediately identified overkill." A few questions later, he stated that based on using his "epidemiologically routinely," he had "immediately opined that more likely than not she knew the perpetrator, perpetrators."

Defendant also asserts that Dr. Omalu's opinion "was less of an opinion than simply weighing in on the facts to assist with the prosecutor's legal objectives[.]" Dr. Omalu did not mention "overkill" or that two knives were used in the Gregor murder in his autopsy report. He testified that he did not know what the relevant legal issues

would be when he performed the autopsy. Before he renders an opinion, he speaks to the prosecutor to learn what the legal objectives are and discuss whether those objectives are consistent with his opinion. Defendant asserts Dr. Omalu narrowed his opinion about overkill and other factors to adjust to the prosecutor's theory of the case.

Initially, if Dr. Omalu exceeded the trial court's earlier ruling on the extent he could testify of overkill, defendant should have objected to Dr. Omalu's testimony during trial on that ground. He did not and has thereby forfeited this argument. (*People v. Clark* (1992) 3 Cal.4th 41, 125-126, abrogated on a different ground as recognized in *People v. Edwards* (2013) 57 Cal.4th 658, 704-705.)

In any event, Dr. Omalu's testimony did not prejudicially exceed the trial court's ruling. The court ruled that Dr. Omalu could testify from his training and experience that overkill victims often know their perpetrators, and that given the overkill pattern he saw in Wiederrich's murder, the perpetrators may have known Wiederrich. He could not, however, say " 'they were not complete strangers.' " Dr. Omalu did state first that based on his epidemiology background, he opined that the victim knew the perpetrator. But a few questions later, he clarified that based on his epidemiology background, it was more likely than not the victim knew the perpetrator. In light of all the testimony, it is not probable defendant would have obtained a more favorable outcome had Dr. Omalu not stated the victim knew the perpetrator.

Additionally, defendant misstates Dr. Omalu's testimony regarding discussions with the prosecutor. Dr. Omalu did not state he bases his opinions on the prosecutor's objectives. Rather, the prosecutor seeks to know whether his or her legal objectives are consistent with Dr. Omalu's opinion. Dr. Omalu explained that his opinions that the murders involved overkill and two knives were used in the Gregor murder were not contained in his autopsy report because that report is a narrative description of the autopsy evidence. When that is issued, he does not know if he will be testifying in the case or if so, what the legal issues would be.

41

Dr. Omalu stated that the prosecutor will call him and say " 'these are our legal complaints or legal objectives. Are they consistent with your opinion? What is your opinion?' And I meet with them. I go back and forth. Sometimes they tell me, 'Oh, can you put it down in writing?' This is where such conceptual issues are discussed. Sometimes I list references. And I come to court to talk about my opinions. Otherwise I could have -- my report could have just been admitted and read out to the jury. We don't do that because as an expert witness I'm here to discuss the medical evidence and legal questions are thrown at me, just like he did, you're doing now. I can't volunteer information unless I'm asked. So that is what I'm here for."

There is no evidence Dr. Omalu tailored his opinions to support the prosecutor's objectives. In sum, the trial court did not abuse its discretion in admitting Dr. Omalu's expert opinion on the points defendant raises here.

V

*Misconduct During Cross-Examination*

A prosecutor's permissible scope of cross-examining a defendant is generally broad. (*People v. Chatman* (2006) 38 Cal.4th 344, 382.) " 'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.' " (*Ibid*.)

A prosecutor, however, may not ask a witness questions " 'that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 562.) A prosecutor may not examine a witness "solely to imply or insinuate the truth of the facts about which questions are posed," rather than for the answers that might be given. (*People v. Visciotti* (1992) 2 Cal.4th 1, 52; *People v. Wagner* (1975) 13 Cal.3d 612, 619-620.) Such questions, where the inquiry is not based

on evidence available to the prosecution, suggest to jurors that the prosecutor has a source of information unknown to them which corroborates the truth of the matters in the question. (*Visciotti* at p. 619.)

Defendant contends the prosecutor committed misconduct when during cross-examination he asked defendant how Wiederrich looked before he stabbed her and whether she could not yell out because she was gagged and could only plead with her eyes.

A.     Background

During the prosecutor's cross-examination of defendant, the dialogue went as follows:

"Q.     Did you hear [Timothy] when he testified and said that you grabbed the butcher knife from the center kitchen island that was used to kill Dorothy?

"A.     I heard when he said that he heard that statement. . . .

"[¶] · · · [¶]

"Q.     And you also heard [James] say that you were the one to stab Dorothy. Do you remember that?

"A.     Yeah, I heard the liar.

"Q.     He said you were the one stabbing her. Do you remember him saying that?

"A.     You just asked that. I said, I heard the liar.

"Q.     You got to answer yes or no.

"A.     Yes, I heard the liar.

"Q.     But -- but you're not lying. You're telling us the truth; right?

"A.     We're going to make that objection later. Prosecutorial misconduct. Yes, I'm telling the truth.

"Q.     How did Dorothy look right before you started stabbing her?

"A.     Objection.

"THE COURT:  Overruled.  You can answer the question.

"[Defendant]:  I have no idea.

"[The prosecutor]:  Q.  She couldn't yell out, could she?  She was gagged.

"A.    I have no idea.

"Q.    She'd only plead with her eyes, couldn't she?

"A.    I have no idea.  Objection."

B.    <u>Analysis</u>

Defendant first contends the prosecutor committed misconduct when he asked him how Wiederrich looked before he stabbed her.  Defendant acknowledges there was testimony from the informants that he stabbed Wiedererich, but he asserts the question presupposed he was guilty of her murder and presupposed the informants were telling the truth.  Defendant claims a prosecutor "has no business using argument or cross-examination as a basis to testify before the jury."

The authority defendant cites to support his quoted statement does not apply.  In *People v. Hill* (1998) 17 Cal.4th 800, the California Supreme Court ruled that the prosecutor in that action committed misconduct by, among other practices, mischaracterizing the evidence and referring to facts not in evidence in her closing argument.  (*Id*. at pp. 823-829.)  Referring to facts not in the record is misconduct because "such statements 'tend[] to make the prosecutor his own witness — offering unsworn testimony not subject to cross-examination.  It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." ' "  (*Id.* at p. 828.)

Defendant directs us to no evidence in the record showing the prosecutor here engaged in such conduct.  The prosecutor's asking defendant how Wiederrich looked before he stabbed her was based on facts in the record establishing that defendant stabbed

44

Wiederrich.  Contrary to defendant's assertion, the prosecution may rely on that evidence even if it "presupposes that both [of] these witnesses were telling the truth[.]"  Because the evidence was admitted and before the jury, referring to it in questions did not make the prosecutor a witness or lead the jury to believe the prosecutor had other evidence outside the record supporting his question.  Defendant had denied any involvement in Wiederrich's murder, and thus the prosecutor was entitled to inquire fully into the facts and circumstances surrounding defendant's testimony and confront him with other evidence that contradicted his testimony.  (*People v. Chatman, supra*, 38 Cal.4th at p. 382.)  Asking the question was not misconduct.

Defendant also contends the prosecutor committed misconduct when he asked whether Wiederrich could not yell out because she was gagged and could only plead with her eyes.  Defendant argues these questions created an "assumption of guilt" and appealed to the jury's sympathy towards the victim.

There is no concern about creating "an assumption of guilt" when the prosecutor's questions were based on evidence in the record, as this question was.  To the extent the question attempted to create sympathy amongst the jurors, any error was harmless.  Misconduct that does not render a trial fundamentally unfair violates California law if it involves the " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' "  (*People v. Clark* (2011) 52 Cal.4th 856, 960.)  Such conduct is prejudicial if it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.  (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

No prejudice exists here.  The jurors were instructed that nothing the attorneys said was evidence, and there is no evidence they were unable to follow this instruction.  We presume the jury followed the instructions.  (*People v. Edwards, supra,* 57 Cal.4th at p. 764.)  Defendant maintained his innocence throughout his testimony, including under cross-examination.  And, for the reasons explained above, the evidence supporting the

verdict is sufficiently strong such that there is no reasonable probability defendant would have obtained a more favorable result had the prosecutor not asked defendant whether Wiederrich could only plead with her eyes.

VI

*Misconduct During Closing Argument*

Mischaracterizing the evidence and denigrating opposing counsel are forms of misconduct. (*People v. Hill, supra*, 17 Cal.4th at pp. 823, 832.) Defendant contends the prosecutor committed both types of misconduct in his closing argument when he (1) ignored one of Dr. Omalu's two formulations of the more likely than not standard; (2) claimed Dr. Raven did not use the term reasonable degree of medical certainty; and (3) suggested defense counsel had misrepresented when he argued that the more likely than not standard was akin to the preponderance standard.

A.      Background

Dr. Omalu testified it was less likely there was a single perpetrator in Gregor's murder. He could not say there were two people, but based on the evidence, it was more likely than not, "meaning a greater than chance or greater than 50 percent probability" there were two perpetrators. The absence of any response to the attack by Gregor suggested to Dr. Omalu that Gregor "was held down, overwhelmed, immobilized."

Based on conducting Gregor's autopsy, Dr. Omalu testified it was more likely than not that two knives may have been used in Gregor's murder. On that point, Dr. Omalu defined more likely than not differently as meaning a reasonable degree of medical certainty. He explained, "Medicine is not an absolute science. It's not mathematics, like when you say one plus one equals two. If you have medical certainty, more likely than not scientific meaning it has 90 to 95 percent confidence interval.

"[¶] . . . [¶]

"Scientifically when we say that, what it means 90 to 95 confidence interval scientific terminology but it's within a reasonable degree of medical certainty. Not absolute. Science doesn't give you 100 percent absolute certainty, no." Later, Dr. Omalu again agreed with the prosecutor that it was more likely than not that two people were involved in Gregor's murder.

Dr. Raven defined reasonable degree of medical certainty as a legal term. She stated she only uses that term when she is asked it in court. When she is asked, she understands it to mean "am I 51 percent sure of my answer." To her, it was another term for more likely than not, and it was a term she did not use very often.

During his closing argument, while comparing the beyond a reasonable doubt standard of proof with the more likely than not and clear and convincing standards, defense counsel discussed Dr. Omalu's use of the more likely than not standard. Counsel stated, "Now more likely than not to two out of our three doctors – actually if you read his testimony early in his testimony it was three of three. But more likely than not means 50 percent plus one, okay. More likely than not does not mean 90 to 98 percent, okay. That is that -- is patently false, okay. If you listen to what he was saying, see, there's a -- you know, if he talks about it's a statistical analysis, okay, it's a statistical analysis, every time he said that, and that's simply – it's simply – it's simply misleading there's no doubt about it. See, the impression is that Dr. Omalu wants you to believe, see, when he has an opinion it's 90 to 98 percent but with other people it's 50 percent plus one, which is ridiculous."

In rebuttal, the prosecutor responded to defense counsel's argument. He stated, "The defense argued to you just now that Dr. Omalu's 'more likely than not' opinions are only opinions based on a preponderance of the evidence. More than 50 percent. Well, Dr. Omalu said when he says 'more likely than not,' that's not more than 50 percent. He said it's 90 to 98 percent. He said to him it means 'to a reasonable degree of medical certainty.' That means 90 to 98 percent. They asked Dr. Raven. She said she doesn't use

that term. The term she would use would be 'to a reasonable degree of medical certainty.' That is 90 to 98 percent.

"He told you his opinions are based on scientific evidence, not something that he made up. They don't want you to believe his opinions are only, 'Well, if he says two,' and Dr. Raven says, 'Well, could be more than two. Could be one.' They don't want you sitting here saying, 'Well, man, Dr. Omalu says 90 to 98 percent.' That's a reasonable degree of medical certainty. That means there is likely two people in that house. They don't want that. Two people in that house is not good."

B.      Analysis

Defendant argues the prosecutor's statements were misconduct. The prosecutor did not acknowledge that Dr. Omalu had used two different definitions of the more likely than not standard. Initially, Dr. Omalu said the standard meant more likely than not, meaning a greater than 50 percent chance. Later, he equated the standard to a reasonable degree of medical certainty, which he defined as having a scientific meaning of 90 to 95 percent confidence interval.

Defendant also asserts the prosecutor incorrectly stated Dr. Raven did not use the term reasonable degree of medical certainty. She actually said she did not use the term often. The term is a legal term used in court. She understood it to mean whether she was 51 percent sure of her answer.

Additionally, defendant claims the prosecutor denigrated defense counsel when he implied counsel had misrepresented Dr. Omalu's testimony when counsel argued that Dr. Omalu's more likely than not standard was akin to the preponderance standard.

Assuming only for purposes of argument that the prosecutor's statements rise to the level of misconduct, there is no prejudice. When the claim of misconduct focuses on comments the prosecutor made to the jury, we determine prejudice by asking "whether

48

there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

It is not reasonably likely the jury applied the prosecutor's remarks in an objectional fashion. The jury heard the expert witnesses' and the attorneys' varying definitions of more likely than not and were able to determine which definition to credit. The jurors' hearing that Dr. Raven either did not use the term medical degree of certainly or did not use the term often would not have confused them in a prejudicial manner, nor would hearing that that the opposing attorneys disagreed on what a witness said. The jurors had heard Dr. Omalu's testimony and knew he had assigned different definitions to the more likely than not standard. In addition, the jury was instructed that the attorney's arguments were not evidence and that only the witnesses' answers were evidence. There is nothing in the record showing the jurors did not follow this instruction. (*People v. Edwards, supra*, 57 Cal.4th at p. 764.) As already stated, the evidence was sufficiently strong such that a different outcome was not reasonably probable. Moreover, the prosecutor's statements did not infect the trial with such unfairness they made the conviction a denial of due process. (*People v. Morales, supra*, 25 Cal.4th at p. 44.)

VII

*Out-of-State Priors as Strikes*

For a foreign conviction to be considered a strike under California sentencing law, the crime must be such that, if committed in California, it would be punishable in state prison, and it must include all the elements of the equivalent serious felony described in the three strikes law. (*People v. Warner* (2006) 39 Cal.4th 548, 552-553.)

Defendant contends his two strikes are based on out-of-state convictions of crimes that do not qualify as strikes under California law. His two strike priors were based on two guilty pleas to robbery in Virginia. Defendant contends that unlike under California law, robbery is a general intent crime in Virginia and does not require the prosecutor to

49

establish the defendant specifically intended to permanently deprive the property owner of its property. Lacking an element of robbery under California law, his foreign convictions thus cannot qualify as strikes.

Defendant's argument is incorrect. Although robbery is a common law crime in Virgina, an element of the crime is specific intent. Virginia law defines robbery as " 'the taking, with intent to steal,' " of the personal property of another by violence or intimidation. (*Ali v. Commonwealth* (2010) 280 Va. 665, 668.) In Virginia, "[p]roof of intent to steal is, of course, necessary to a conviction of robbery. . . . [¶] The felonious intent to steal, or the *animus furandi*, is as necessary to constitute robbery as it is to constitute larceny. The robber must have a fraudulent intent, *and must intend to deprive the owner permanently of his property*." (*Pierce v. Commonwealth* (1964) 205 Va. 528, 532-533, italics added.)

Because the offense in both states requires a showing of specific intent to permanently deprive the property owner of the property, defendant's Virgina robbery convictions qualify as strikes for purposes of the three strikes law.

VIII

*Multiple-Murder Special Circumstances*

The information alleged a multiple-murder circumstance in connection with each murder, and the jury found both true. Defendant contends only one special circumstance is proper under these circumstances, and he asks us to strike one of the findings.

The Attorney General agrees with defendant, as do we. Two murders support only one multiple-murder special circumstance. (*People v. Avena* (1996) 13 Cal.4th 394, 425.) We will order one of the findings to be stricken.

## IX

### *Cumulative Error*

Defendant contends the errors he alleged cumulatively deprived him of his right to due process. " 'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." ' " (*People v. Planchard* (2025) 109 Cal.App.5th 157, 178.) " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*Ibid*.) In light of all the evidence presented against defendant as discussed above, and considering the errors cumulatively, it is not reasonably probable defendant would have obtained a more favorable result in their absence. Defendant received due process and a fair trial.

### DISPOSITION

We strike the multiple-murder special circumstance found true in association with count 5 of the information. In all other respects, the judgment is affirmed.

_____
HULL, Acting P. J.

We concur:


_____
RENNER, J.


_____
MESIWALA, J.